## ASHEVILLE CIGAR COMPANY *et al. v.* BROWN, receiver, *et al.*

Whether or not the Governor of this State has power, because of maltreatment of convicts who may be committed to their care, to impose fines upon the penitentiary companies who, under the lease act, have control of convicts, he has full power for such cause to vacate the leases under which such convicts may be held; and therefore, where the property of one of such penitentiary companies, of which the convicts held by them constituted a valuable asset, was placed (whether rightfully or not) in the hands of a receiver, and while it was thus held, the Governor, upon evidence satisfactory to him of maltreatment of convicts, made an order directing that the lessee pay to the State, by way of damages for its wrongful act, a sum certain, reserving the alternative to take such further action as he might thereafter deem proper looking toward vacating the lease under which such convicts were held, in the event of the non-payment of the sum so assessed, the court, upon application of the receiver for direction in the premises, neither abused its discretion nor committed any error of which creditors interested could complain, in directing the receiver to pay such sum in order to retain the convicts, and thus maintain the value of the other assets which were in its custody. Whether the assets in the hands of the court were legally liable for the payment of the sum assessed or not, yet, inasmuch as the property in question was, according to the record, of far greater value than the sum assessed against it, and its retention by the court was made dependent under this executive order upon the payment of the sum assessed, the discretion of the chancellor was not improperly exercised in directing its payment.

Argued January 8,—Decided January 21, 1897.

Petition for direction. Before Judge Lumpkin. Fulton superior court. March term, 1896.

Upon the petition of creditors of the Georgia Mining, Manufacturing and Investment Company, a corporation organized May 1, 1889, under a charter granted by the superior court of Fulton county on March 19, 1889, a receiver for its assets was appointed on January 31, 1895. Its capital stock was made up of the stocks and bonds of the Dade Coal Company, a corporation by act approved February 21, 1873, amended in 1874 and 1877, and of other companies. On June 21, 1876, the Dade Coal Company leased from the State 300 convicts for twenty years from April 1, 1879, and by executive order it was made Penitentiary Company Number 1. It afterwards became the owner of portions of the stock of Penitentiary Companies Numbers 2 and 3. On May 8, 1889, the Ga. Mining etc. Co. and the Dade Coal Co. entered into a contract, whereby the coal company leased to the mining company all of its property except its rights under the lease with the State, reserving to itself the convicts so leased. The mining company agreed to furnish to the coal company such moneys as it might need from time to time to work its convicts upon the properties of the coal company hereby leased, or upon such other properties as the coal company might vote for said convicts to be worked upon, in accordance with the laws of the State; also, to furnish all moneys needed to pay the rental to the State, the salaries of guards, and for bosses and superintendents, and all moneys necessary to feed, clothe, and in all respects to enable the coal company to comply with its contract with the State, and to pay all penalties for escapes, and all damages which might be incurred by the coal company in any way in the use of the convicts. On January 3, 1896, an executive order was made by the Governor of the State, reciting that the legislative committees, in their general reports to the legislature at its late session, had preferred serious charges against the convict lessees, relative to their management, control and

treatment of the convicts, copies of said reports being attached to the order, which thereupon directed that Penitentiary Company Number 1, as well as the individual lessees in charge of each convict camp of said company, be cited to appear before the Governor on the 10th of the next month, to answer said charges and show cause why the penalties provided by law for such alleged misconduct should not be inflicted. On the day set for said investigation, the receiver appeared and made defence to the charges; and after hearing the evidence adduced, the Governor passed an order imposing a fine of $750 upon Penitentiary Company Number 1, one of $500 upon Penitentiary Company Number 2, and and one of $500 and one of $750 upon Penitentiary Company Number 3, for violations of the rules and regulations for the control of convicts; and stating that in default of payment of said fines by July 15, 1896, the Governor would consider the question whether said camps should be abolished or the lease contracts of said companies should be cancelled. This order recites, that while the evidence introduced at the hearing showed that there had been such violations of the rules and regulations for the control and management of the convicts as might authorize the executive to cancel the original lease contracts or abolish certain camps and vacate the lease contracts so far as they apply to certain members or stockholders in the three penitentiary companies, it was deemed to the best interest of the State to hold in reserve these questions for further orders, and prior to further consideration of the same to impose the fines mentioned. Thereupon the receiver brought his petition for direction, from which the foregoing facts appear. He alleged, that under the evidence there should have been no finding whatever against the companies in which he had an interest as receiver, but that the proof clearly showed that there was no fault or violation of the law at any of the camps controlled by him. He set forth, as illustration, various allegations of matters of fact;.

and asked the court to consider the full report of the evidence so far as related to the convicts under his care and keeping, from which it would appear that he had complied with all of the lawful requirements as to the management and control of said convicts. He further alleged, that in issuing the summons and having the hearing, the Governor assumed to exercise judicial functions at the same time that he was exercising executive powers, which under the constitution he had no power to do; that by virtue of the lease act whereby the contract was made between the State and the penitentiary companies, the Governor had no authority to fine said companies, but could only forfeit the leases; that it is not within the power of the Governor under the law to forfeit the leases or impose any penalties on the lessees for or on account of acts of any whipping-bosses appointed by the Governor, etc. Further, for several years past, in the keeping and working of the convicts the corporations controlled by the receiver have lost money, and he has so continued to lose, and if he had not been compelled to care for the convicts, the properties under his control could have been shut down when it was not profitable to operate them. He believes it would be to the best interest of the estate committed to him not to pay the fines so imposed, but to permit the Governor to forfeit the leases and assume control of the convicts. If ordered to pay the fines, the receiver hath not the money. A large amount of receiver's certificates are past due and unpaid, because he has been unable to get funds to pay them and at the same time to feed and clothe the convicts. He has not been able to pay the amount due the State for rental, or for taxes, nor to borrow money on receiver's certificates to make said payments.

In rendering judgment upon this petition and other matters which were heard with it, the presiding judge noted the fact that neither the State nor the Dade Coal Company is a party to the cause. He declined to undertake to review the Governor's acts or findings, or to make any order affecting

any liability of the penitentiary company or companies to the State. He directed that the receiver carry out the contract of May 8, 1889, between the coal company and the mining company, as far as practicable, and to pay for the coal company the amount required for the payment of the fines referred to, by or before July 15, 1896, from any funds in his hands over and above the amount required for operating expenses. A bill of exceptions assigning errors upon these rulings is brought by several creditors of the mining company, whose assets would be required, under the judgment, to pay said fines.

*C. B. Reynolds* and *Culberson & Blalock*, for plaintiffs in error.

ATKINSON, Justice.

Under the facts stated in the record, the circuit judge committed no error in giving to the receiver the direction therein indicated. The Dade Coal Company was a corporation, and leased from the State of Georgia three hundred convicts; by executive order it was made Penitentiary Company No. 1, and afterwards became the owner of portions of the stock of Penitentiary Companies Nos. 2 and 3. On May 5th, 1889, it leased to the Georgia Mining, Manufacturing & Investment Company all of its property of every character, except its right to control the convicts leased to it by the State. In speaking of the two corporations we will, for convenience, hereafter designate them as the coal company and the mining company respectively. The mining company agreed to furnish to the coal company from time to time all the moneys it might need in order to work its convicts. The convicts were to be employed in working the properties of the coal company, which had been leased as above stated, and upon such other property as the coal company might direct them to be worked, in accordance with the laws of the State. It undertook to furnish to the coal company all moneys needed to pay the rental to the State, the salaries of

guards, bosses and superintendents, and all moneys necessary to feed and clothe the convicts, and in all respects to enable the coal company to comply with its contract with the State, and as well to pay all penalties for escapes, and all damages which might be incurred by the coal company in any way by the use of the convicts. The capital stock of the mining company was made up of the stocks and bonds of the coal company and certain other incorporated companies.

It will be seen that, except nominally, there was a complete amalgamation of the two companies. The mining company absorbed the coal company, except in so far as the separate entities were maintained, in order to enable the coal company to retain its possession and control of the convicts. Under the contract between the two corporations, the earnings of the convicts belonged to the mining company. That company undertook to provide the means for the support and maintenance of the convicts, and to enable the coal company to discharge its obligations to the State, resulting from its lease of these convicts.

Nominally the right to the labor of the convicts was in the coal company; practically the beneficial interest was in the mining company. Nominally the convicts were under the control of the coal company; but the mining company being the owner of all of the capital stock of the coal company, the control of the convicts was practically under and subject to its direction. Therefore, the provision in the lease to the effect that the convicts should be employed upon the property leased by the coal company to the mining company, and upon such other property as the coal company might direct, gave to the mining company the power, in the name of the coal company, to direct that the convicts be employed at such place and under such circumstances as it might choose to direct; and this is true notwithstanding the statement in the agreement between the parties to the effect that no control of the convicts was leased or parted with by the coal company, but that the same was held and reserved to it in

accordance with its contract of lease with the State of Georgia, and under the laws of the State of Georgia. The coal company would not have had the power to sublease the convicts so as to permit them to pass from under its control, but practically that result was accomplished when the mining company became the owner of the capital stock of the coal company. In other words, the mining company being the owner of the capital stock of the coal company, the will of its board of directors became the will of the board of directors of the coal company; thus, the property of the coal company became, by virtue of the lease above referred to, the assets of the mining company, with the exception only that the coal company retained the nominal control of the convicts; but under the contract entered into between the parties, the earnings of the convicts employed by the coal company, under the direction of the mining company, belonged to the latter company; so that when the court seized the assets of the latter company, while the nominal control of the convicts remained with the coal company, there was such an intimate association between the assets which passed under the control of the receiver and those of the coal company, over which it yet retained control, as that it was still necessary for the receiver to maintain the same relations with the coal company as had existed between the coal company and the mining company. The mining company took the assets of the coal company as a whole. It would not have been at liberty to refuse to discharge the obligation imposed upon it with reference to the maintenance and support of the convicts, and at the same time retain the assets otherwise received from the coal company. The receiver occupied no better position as to the existing contractual relations. The same duties rested upon him as would have rested upon the mining company. The right to the labor of the convicts upon the terms stated was as much the assets of the mining company as any part of its property; and whether the Governor of the State had authority or not to impose, in the particular

instance, the penalty assessed against the coal company, the mining company was under obligation, by express contract, to pay all damages which might be incurred by the coal company in any way in the use of the convicts. The Governor had ample authority, under the lease act, to vacate the lease under which the convicts were held, if he saw proper to do so; and that he saw proper to apply less drastic measures is certainly no cause of complaint upon the part of the penitentiary company.

At all events, the court, under the contract in question, was entitled, through its receiver, to the labor of the convicts. It could compel the coal company, as the custodian of these convicts, to comply with its contract for working them: so that, treating the two corporations as entirely separate and distinct entities, the interest of the mining company in the labor of the convicts, under its contract with the coal company, constituted a valuable asset in the hands of the court to be administered for the benefit of all concerned. When, therefore, the court had the election either to direct the receiver to discharge the sums assessed against the coal company by way of damages, or to refuse to pay this, and incur the risk of having the lease vacated, and thus lose its interest in the labor of the convicts, it exercised a wise discretion in choosing the former rather than the latter alternative.

*Judgment affirmed. All the Justices concurring, except Little, J., disqualified.*